# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| ERIC HOOD, | No. 59242-8-II |
| Appellant, | |
| v. | |
| THE CITY OF VANCOUVER, | PUBLISHED OPINION |
| Respondent. | |

GLASGOW, J.—Eric Hood emailed a City of Vancouver employee asking for records from the most recent audit of the Downtown Redevelopment Authority (DRA), a local entity created by the City. City employees responded to the request and were initially confused about the extent of the records Hood sought. At first, the City sent Hood only a link to access the official audit report. After asking for clarification from Hood, the City understood that he wanted "records sent/received; to/from; state auditor's office." Clerk's Papers (CP) at 37. The City searched for responsive records in its document management database and its website and provided those records to Hood. It is not clear whether the City searched email accounts.

Hood sued the City for violating the Public Records Act (PRA), ch. 42.56 RCW, by withholding records responsive to his request. The trial court granted summary judgment to the City and dismissed Hood's complaint. Hood appeals.

We conclude that while Hood's request was ambiguous in some respects, it plainly encompassed emails that the DRA got from the state auditor related to the DRA's most recent

59242-8-II

audit. Because it is not clear from this record whether the City searched for emails responsive to Hood's request, there is a genuine issue of fact as to whether the City conducted an adequate search under the PRA. Thus, we reverse the summary judgment for the City and remand for further proceedings consistent with this opinion.

FACTS

I. BACKGROUND

A.    Hood's Initial Public Records Request

On May 27, 2022, Hood emailed Natasha Ramras, an employee of the City, intending to request records from the 2020 audit of the DRA. The DRA is an entity created by the City that is audited by the state auditor. Hood's public records request read:

> I understand that your organization was recently audited by the state auditor and a report was published. May I have all records it got from the auditor and all records of its response to the audit or to the audit report, including any changes to policy or practices?

CP at 434. Ramras was the chief financial officer of the City and the director of the City's finance department. She was also the executive director of the DRA.

That same day, Ramras forwarded Hood's email to Jordan Sherman, the City's internal auditor. Because the request did not specify, both Ramras and Sherman apparently read the request to refer to the City's most recent audit, rather than the DRA's. Ramras asked Sherman to register Hood's public records request with Raelyn McJilton, the City's public records officer, and send Hood "a link to the audit report." *Id.* As public records officer, McJilton acted as the City's point of contact for public records requests.

Sherman then emailed McJilton asking for guidance on how to respond to Hood's request:

> Should I reach out to [Hood] to have him fill out the public records request on our website? I can certainly send him a link to the [state auditor's] website which has all of our reports (any official response to the audit/audit report would be included

2

in the audit report, but this is only done for findings). *There are lots of back and forth emails, and* [*the state auditor*] *has made other recommendations not included in our audit reports*. None of this is prescriptive so it is sometimes hard to say if any policy or practice changes should be considered a "response to the audit or to the audit report", plus many times changes in practices are not documented.

I certainly don't want to be the cause of any non-compliance related to public records requests, so I appreciate whatever guidance you have on this matter.

CP at 433 (emphasis added). McJilton told Sherman that Sherman should give Hood the link to

the state auditor's website, and McJilton would work with Hood "on the remainder of his request."

*Id.* As a result, that same day Sherman emailed Hood, explaining:

The Auditor's Office conducts several audits of the City of Vancouver every year. In addition they make all the audit reports they publish available on their website as soon as they are published, making it the best place to get the most current audit results. . . .

Below is a link to the State Auditor's Website where you can search for exactly the report you would like to review. Simply put "City of Vancouver" in the search "BY GOVERNMENT NAME" search box and you will see all the most current audit reports for us.

CP at 436. In the meantime, McJilton registered Hood's request in the government's online public

records system, which sent Hood an automated email repeating his initial request. Hood replied to

this automated email: "I made a request to the Downtown Redevelopment Authority on 5/27." CP

at 34.

B.     The Downtown Redevelopment Authority

The City created the DRA in 1997 to manage the construction and maintenance of the

Vancouver Convention Center Hotel project. RCW 35.21.730(5); VANCOUVER MUN. CODE

2.73.010(A). The DRA is a "component unit" of the City, and the City has authority over the DRA.

CP at 278. The DRA does not have any employees; it has a board of seven members appointed by

the City. Ramras served as the executive director of the DRA. Because the DRA did not have any

employees, she worked with city staff on financial, administrative, and legal support for the DRA.

3

On the DRA's website, the only contacts listed are three city employees, including Ramras, with their city email addresses.

Because the DRA's "services do not exclusively or almost exclusively benefit the City," the state auditor audits the DRA separately from the City. CP at 278. Generally, the state auditor examines the "financial affairs of all local governments," including cities and municipal corporations like the DRA. RCW 43.09.260(1), (3). If the state auditor finds noncompliance, it includes that finding in its audit report. The audited entity then can prepare a response to the finding of noncompliance, which is included in the final audit report. Finally, replying to the audited entity's response, the state auditor prepares "'remarks,'" which are also included in the final audit report. CP at 428.

As the director of the City's finance department, and because the DRA had no employees, Ramras worked with the state auditor on audits of the DRA. At the time of Hood's request, the DRA's most recent audit was published in 2020.

C.    Hood's DRA Public Records Request

On June 1, 2022, in response to Hood's specific request for DRA audit records, Sherman emailed Hood with the same link to the state auditor's website and instructed Hood to type, "Downtown Redevelopment Authority" into the appropriate search box. CP at 33.

Also on June 1, 2022, McJilton emailed Hood:

Your request requires clarification before the City may respond pursuant to RCW 42.56.520.

We have previously provided you a link to the State Auditor[']s office which has both the City of Vancouver and Downtown Redevelopment Authority Auditor[']s reports and findings. . . .

Can you please tell me what else you are seeking?

CP at 32.

4

Hood replied to McJilton:

> Regarding the most recent state audit, I seek all records the Downtown Redevelopment Authority got from the auditor and all records of its response to the audit or to the audit report, including any changes to policy or practices.

CP at 31. McJilton emailed Ramras asking who to work with for Hood's updated request. Ramras told McJilton to cooperate with Sherman because Hood "was asking for the same information for the City last week." CP at 37. In an email exchange, Sherman asked McJilton if Sherman should just send Hood the link to the state auditor's website again. McJilton replied, "I did that already. *Now he wants records sent/received; to/from; state auditor's office*." *Id.* (emphasis added).

On June 6, 2022, McJilton emailed Hood that the City needed more time to respond to his public records request. To find responsive records, McJilton searched the City's document database with search terms "audit" and "state audit." CP at 26. McJilton also searched the City's website.

> On June 21, 2022 McJilton emailed Hood:
>
> The enclosed records are comprised of 46 pages which includes the City's response letter. We did not make any formal policy changes.
>
> If you feel that there are any missing documents or additional types of materials that your request sought, which are not included in the enclosed response, please contact me so your request may be clarified.
>
> This concludes the City's response to the above-mentioned request. If you have any questions, please feel free to contact me.

CP at 29. The documents attached to this email included some records related to a 2019 audit of the City. The response did not include any additional documents related to the latest audit of the DRA, nor did it include any emails. Hood did not reply to McJilton's final June 21 email.

5

## II. PROCEDURAL HISTORY

Hood filed a complaint against the City almost a year after he received the final email from McJilton. At the time, Hood was not represented by counsel. He claimed that the City violated the PRA by withholding and failing to search for and produce responsive records.

The City moved for summary judgment. The City argued that it was an improper defendant because Hood should have sued the DRA. And even if the City was the proper defendant, the City sufficiently responded to Hood's public records request by attempting to clarify what records he sought and providing responsive records. The City included declarations from Ramras, Sherman, and McJilton, with accompanying exhibits.

In her declaration, McJilton explained her search for responsive records:

> I searched the City's document management software/database (eDOCS) using the search terms "audit" and "state audit." I also searched the City's website. These were the locations Mr. Sherman advised would be the best locations where to find responsive records.

CP at 26. Sherman's declaration explained that there was no response to the state auditor from the DRA for the two most recent audits of the DRA because the auditor did not make any findings requiring a response.

Our record does not show whether city emails would have been included in the City's eDOCS database search, nor is there evidence that McJilton or another city employee separately searched email accounts.

Ten days after the City's summary judgment motion was filed, Hood made a separate public records request to the state auditor:

> Regarding your audit of the Downtown Redevelopment Authority (see attached), please produce all records the City of Vancouver got from the [state auditor] and all records of its response to the audit or to the audit report, including any changes to policy or practices.

6

CP at 344. The state auditor responded to Hood's request with over 100 emails, many of which were exchanged between its office and city employees mentioning the DRA. However, only four of those emails were dated before May 27, 2021, which is when Hood made his initial public records request to the City. It is unclear whether the City also retained copies of these emails, and if so, whether they would have been responsive to Hood's request to the City. The remaining emails exchanged after the date of Hood's request to the City would not have been responsive because an agency does not have a continuing obligation to produce records created after the date of the request. *Gipson v. Snohomish County*, 194 Wn.2d 365, 373, 449 P.3d 1055 (2019).

After the City filed its summary judgment motion, Hood acquired counsel. Hood's counsel filed a response to the City's summary judgment motion, along with a declaration from Hood. Hood's response suggested that the City's failure to disclose some "communications" could have been the result of an inadequate search. CP at 323.

For various reasons related to the unavailability of each party's counsel, the summary judgment hearing was delayed to almost three months after the City filed its original summary judgment motion. At the summary judgment hearing, Hood's counsel argued that further discovery was necessary to determine whether the City was acting on behalf of the DRA when responding to Hood's request. Hood's counsel then verbally requested the opportunity to conduct further discovery.

The trial court denied any continuance under CR 56(f) because the summary judgment motion had been pending for almost three months, which was "more than enough opportunity" for Hood to conduct discovery and make a more formal, written CR 56(f) request if he needed additional time. Verbatim Rep. of Proc. (VRP) at 18. The trial court found that there were "some factual issues" about whether the City, rather than the DRA, was the proper defendant in this case.

VRP at 20. However, the trial court concluded that even if the City was the proper defendant, there was not a genuine issue of material fact as to whether the City's responses to Hood's public records request were sufficient; they were. The trial court granted the City's summary judgment motion.

Hood then brought a CR 59 motion to reconsider and vacate the trial court's summary judgment order. Hood claimed that he had newly discovered evidence that the City withheld records. To demonstrate this, he attached the state auditor's response to his September public records request. Hood argued that though these records were generated after his public records request to the City, they showed that the City normally had email exchanges with the state auditor regarding audit reports. And the City sent no emails to him in response to his request. He also argued that the trial court misinterpreted the law about public records requests, and it erred when it stated that Hood's request was unclear and that the City appropriately asked for clarification. The trial court considered this new evidence and denied Hood's CR 59 motion.

Hood appeals.

ANALYSIS[1]

I. THE CITY'S SEARCH FOR RECORDS IN RESPONSE TO HOOD'S PUBLIC RECORDS REQUEST

Hood argues that there was a genuine issue of material fact about whether the City's response to his public records request was sufficient under the PRA.

The PRA is a "'strongly worded mandate for broad disclosure of public records.'" *O'Dea v. City of Tacoma*, 19 Wn. App. 2d 67, 78, 493 P.3d 1245 (2021) (internal quotation marks omitted) (quoting *Serv. Emps. Int'l Union Loc. 925 v. Univ. of Wash.*, 193 Wn.2d 860, 866-67, 447 P.3d 534 (2019)). Under the PRA, a government agency must disclose responsive records to a requester unless a specific exemption applies. *Id.* at 79; RCW 42.56.070(1). We liberally construe the terms of the PRA in favor of the requester. RCW 42.56.030. The PRA "establishes a strong presumption in favor of full disclosure of public records." *Zink v. City of Mesa*, 140 Wn. App. 328, 337, 166 P.3d 738 (2007). "Given the strong presumption in favor of full disclosure, an agency should not unreasonably assume a narrow interpretation of a request." *Cantu v. Yakima Sch. Dist. No. 7*, 23 Wn. App. 2d 57, 99, 514 P.3d 661 (2022).

"A trial court reviews agency actions under the PRA de novo and 'may conduct a [PRA] hearing based solely on affidavits.'" *O'Dea*, 19 Wn. App. 2d at 79 (alteration in original) (quoting

_____

[1] In his notice of appeal, Hood only designates the trial court's denial of his CR 59 motion to reconsider summary judgment; he does not mention the underlying grant of summary judgment. In its brief, the City notes this omission. The City does not argue that Hood failed to properly appeal the summary judgment order.

We will review an order that was not designated in the notice of appeal if it "prejudicially affects the decision designated in the notice." RAP 2.4(b). "An order 'prejudicially affects' the decision designated in the notice of appeal where its designated decision would not have occurred in the absence of the undesignated ruling or order." *Gomez v. Sauerwein*, 172 Wn. App. 370, 376, 289 P.3d 755 (2012).

Here, the trial court could not have ruled on Hood's CR 59 motion to reopen the summary judgment order without the existence of the underlying summary judgment order. Thus, the summary judgment order prejudicially affects the trial court's CR 59 decision and this court may consider the summary judgment order on appeal.

59242-8-II

RCW 42.56.550(3)). We review both the agency's actions and the trial court's conclusions of law de novo. *Id.*; *see also* RCW 42.56.550(3).

We apply the same standard as the trial court when reviewing a summary judgment decision. *O'Dea*, 19 Wn. App. 2d at 79. Under this standard, summary judgment is appropriate if, viewing all evidence in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.*; CR 56(c). "We review the trial court's conclusions of law de novo and may affirm on any basis supported by the record." *O'Dea*, 19 Wn. App. 2d at 79; RAP 2.5(a).

A.      Hood's Public Records Request and Clarification

Hood argues that his public records request was clear and required no clarification. He claims that even if parts of his request were ambiguous, the City should have known that just sending a link to the DRA final audit report was not sufficient.

RCW 42.56.080(1)(a) provides, "A public records request must be for identifiable records." A record is identifiable when the requester gives "a reasonable description enabling the government employee to locate the requested record." *Beal v. City of Seattle*, 150 Wn. App. 865, 872, 209 P.3d 872 (2009).

Under RCW 42.56.520(3)(a) and (b), an agency is required to seek clarification for an unclear request. *Neigh. All. of Spokane County v. Spokane County*, 172 Wn.2d 702, 727, 261 P.3d 119 (2011). The PRA does not "require public agencies to be mind readers." *Bonamy v. City of Seattle*, 92 Wn. App. 403, 409, 960 P.2d 447 (1998). However, the agency must respond to the parts of a request that are clear. RCW 42.56.520(3)(b).

Hood initially requested "all records [your organization] got from the auditor and all records of its response to the audit or to the audit report, including any changes to policy or

10

practices." CP at 434. Hood argues that his public records request clearly indicated that the City should provide (1) all records the DRA got from the auditor about the audit, (2) all records the DRA sent to the state auditor in response to the audit process, and (3) all records the DRA created in response to the audit report.

Hood's initial request left open several points of ambiguity. First, he requested records from "your organization," which Ramras and other city employees reasonably interpreted to mean the City instead of the DRA. *Id.* And because official responses to an audit are included in the final audit report, Hood's initial request did not necessarily indicate that he wanted records about the response beyond the final audit report itself.[2]

The City initially complied with RCW 42.56.520(3): after directing Hood to the state auditor's final reports for both the City and the DRA's most recent audits, the City expressly asked Hood to clarify which records he sought. Hood responded that he wanted records from the DRA's

---

[2] Hood also claims that the state auditor's response to his September request demonstrates that his original public records request to the City was clear.

However, there are several other Court of Appeals cases where Hood sent public records requests with almost identical language and agencies struggled to interpret exactly which documents Hood sought. *See, e.g.*, *Hood v. Centralia Coll.*, No. 56213-8-II, slip op. at 1-2 (Wash. Ct. App. Aug. 2, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2056213-8-II%20Unpublished%20Opinion.pdf, *review denied*, 200 Wn.2d 1032, 525 P.3d 151 (2023); *Hood v. City of Prescott*, No. 39618-5-III, slip op. at 1 (Wash. Ct. App. Apr. 30, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/396185_unp.pdf; *Hood v. City of Nooksack*, No. 82081-8-I, slip op. at 1 (Wash. Ct. App. Aug. 2, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/820818.pdf; *Hood v. Columbia County*, 21 Wn. App. 2d 245, 247, 505 P.3d 554 (2022).

In one of these unpublished cases, we concluded that Hood's request was ambiguous to some degree. *Hood v. Centralia Coll.*, No. 56213-8-II, slip op. at 8. Though Hood's request pointed to identifiable records regarding a specific topic, the college's 2018 audit, it did not sufficiently describe those records to help the City locate them. *Id.* Although the college was able to determine some records relating to the audit that were responsive, the ambiguity of Hood's request left open multiple interpretations about whether records related to the early stages of the audit were responsive, rather than just records related to the final audit results. *Id.* Notably, the request was clear enough that the college searched the email accounts of employees who were involved in the audit process and disclosed some responsive emails. *Id.* at 11.

most recent audit, but otherwise recited the same request: "Regarding the most recent state audit, I seek all records the Downtown Redevelopment Authority got from the auditor and all records of its response to the audit or to the audit report, including any changes to policy or practices." CP at 31. This only clarified the organization Hood wanted records from, not the scope of the request.

In an email with Sherman, McJilton expressed her understanding from the broader context of the request that Hood wanted "records sent/received; to/from; state auditor's office" regarding the DRA's most recent audit. CP at 37. Thus, at least a portion of the request was clear to the City, and the City was required to search for and produce responsive records to that portion.

We conclude that the request for all records the DRA "got from the auditor" regarding its most recent audit was clear. CP at 31. The plain language of this portion of the request extends beyond just the final audit report that the auditor sent to the DRA.

However, the portion of the request for the DRA's "response to the audit or to the audit report" was ambiguous to some degree. *Id.* It was unclear whether this portion of the request encompassed responses or communications to the state auditor related to stages of the audit before the final audit report containing the DRA's final response to audit findings.

B.    Alleged Request for Clarification in the City's Final Letter

The City claims that it further sought clarification of the request in its last email to Hood, which enclosed some additional records from City audits and stated in part,

> If you feel that there are any missing documents or additional types of materials that your request sought, which are not included in the enclosed response, please contact me so your request may be clarified.

> This concludes the City's response to the above-mentioned request.

CP at 29. This is not a further request for clarification of Hood's request under RCW 42.56.520(3), which does not contemplate clarification *after* a responding agency closes the request. Moreover,

12

RCW 42.56.520(3)(b) plainly requires that the agency must respond to the portions of a request that are clear.

Here, the City stated that it had concluded its response to Hood's request. Thus, its offer that Hood could reach out if he believed any records were missing was an option for Hood to alert the City if he was unsatisfied with the City's final response; it was not a proper request for clarification under RCW 42.56.520(3). Though a requester who is genuinely seeking records would likely have exercised this option and further clarified that he was also seeking email communications, Hood was not required to do so. And the City was required to search for records responsive to the portion of Hood's request that was clear—*all* records related to the most recent DRA audit that the DRA "got from the auditor." CP at 31.

An agency responding to a public records request cannot insulate itself from liability by requiring the requester to identify missing records. Requesters may not be sufficiently familiar with the agency's records to identify missing records.[3] As a result, we conclude that the language recited above was not a sufficient request for clarification such that it could prevent liability for an inadequate search if Hood did not respond.

C.    Adequacy of Search

Hood argues that the City did not adequately search for responsive records to his request. We agree that there is a genuine issue of material fact as to whether the search was adequate.

Under the PRA, agencies must adequately search for responsive records to a request, and "an inadequate search is treated as a PRA violation." *O'Dea*, 19 Wn. App. 2d at 79. An agency

---

[3] Of course, whether a requester has engaged in gamesmanship can be considered at the penalty stage.

does not per se violate the PRA by failing to locate and disclose a record that is eventually found. *Cantu*, 23 Wn. App. 2d at 83. The adequacy of the search itself is what matters. *Id.* at 84.

Whether an agency adequately searched for responsive records depends on the specific facts of the case. *Neigh. All.*, 172 Wn.2d at 720. An adequate search is "reasonably calculated to uncover all relevant documents." *Id.* "[A]gencies are required to make more than a perfunctory search and to follow obvious leads as they are uncovered." *Id.* An agency need not "search *every* possible place a record may conceivably be stored, but only those places where it is *reasonably likely* to be found." *Id.* An agency is only required to provide records that existed at the time of the PRA request. *Gipson*, 194 Wn.2d at 373.

On summary judgment, an agency must show the search was adequate beyond material doubt. *Neigh. All.*, 172 Wn.2d at 720-21. Courts may rely on reasonably detailed and nonconclusory affidavits from the agency about the search terms used, the type of search performed, and whether the places searched were likely to contain all responsive records. *Id.* at 721. Agency affidavits are given a presumption of good faith, and they outweigh "speculative claims about the existence and discoverability of other documents." *Forbes v. City of Gold Bar*, 171 Wn. App. 857, 867, 288 P.3d 384 (2012). Courts consider "the scope of the agency's search as a whole and whether that search was reasonable, not whether the requester has presented alternatives that [they] believe[] would have more accurately produced the records [they] requested." *West v. City of Tacoma*, 12 Wn. App. 2d 45, 79, 456 P.3d 894 (2020).

Hood asserts that McJilton's statement acknowledging that Hood sought "records sent/received; to/from; state auditor's office" demonstrated that the City knew it should have searched for email records responsive to Hood's request. CP at 37. Thus, because the City did not

search for responsive email records, it failed to conduct an adequate search. We agree there is a genuine issue of material fact on this point.

Initially, emails between Sherman and McJilton indicated that they believed the state auditor's final report, including the City's responses and the state auditor's accompanying remarks, satisfied Hood's request. However, when Hood repeated his request almost verbatim after the City sent him a link to the state auditor's final report for the DRA's most recent audit, McJilton opined that Hood was seeking something more than the final report: "Now he wants records sent/received; to/from; state auditor's office." *Id.* In addition, Sherman emailed McJilton that "[t]here are lots of back and forth emails" between the City and the state auditor. CP at 433. But according to her declaration, McJilton searched only the City's eDOCS document database and website for responsive documents; she did not claim to search any emails or other communications.

Though McJilton was not required to search every place a responsive record could be stored, it was reasonably likely that records "sent/received" and "to/from" the state auditor would be found in city or DRA employee email accounts, especially because Sherman told McJilton there were lots of emails between the state auditor and city staff. CP at 37. The City employees' declarations do not provide any explanation stating that emails were included in the databases searched, and if not, why email accounts were not searched. The failure to show a search for responsive records in email accounts, when there is some evidence that related emails existed, creates at least a genuine issue of material fact as to whether the City failed to conduct an adequate search that was reasonably calculated to uncover all relevant documents responsive to the portion of Hood's request that was clear—"I seek all records the Downtown Redevelopment Authority got from the auditor" "[r]egarding the most recent state audit." CP at 31. We reverse and remand for further proceedings consistent with this opinion.

## II. HOOD'S OTHER ARGUMENTS

Because we reverse the trial court's grant of summary judgment and conclude that there is a genuine issue of material fact about whether the City adequately searched for emails responsive to Hood's public records request, we need not address the trial court's denial of Hood's CR 56(f) motion for a continuance nor his CR 59 motion for reconsideration. We also do not address the issue raised below about whether the City is the proper defendant in this case.

## CONCLUSION

We conclude that there is a genuine issue of material fact regarding whether the City adequately searched for records the DRA got from the auditor regarding the most recent state audit. We reverse and remand for further proceedings consistent with this opinion. We leave it for the trial court to determine what further proceedings are necessary.

GLASGOW, J.

We concur:

LEE, P.J.

PRICE, J.